Argued and submitted January 7,
accused reprimanded February 20, 1980

Complaint as to the Conduct of:
JOSEPH N. HERSHBERGER,
*Accused.*

(OSB No. 77-4, SC 26484)

606 P2d 623

Edward Joel Clark, Pendleton, argued the cause and filed the brief for the Accused.

Joseph Larkin, Deputy District Attorney, Wasco County, The Dalles, argued the cause and filed the brief for the Oregon State Bar.

Before Denecke, C.J., Tongue, Howell, Lent, Linde, and Peterson, Justices, and Tanzer, Justice Pro Tempore.

PER CURIAM.

## PER CURIAM.

This is a disciplinary proceeding by the Oregon State Bar charging the accused with having an improper conflict of interest in filing a suit to foreclose a contract naming, as two of the several defendants in that proceeding, a husband and wife then represented by him in a bankruptcy proceeding. The Trial Board, with one member dissenting, found the accused guilty of that charge and recommended that the accused be administered a public reprimand; that he reimburse his former clients for $290 paid by them to other attorneys to complete the bankruptcy proceeding and that he certify that he has done certain things.[1]

The Board of Disciplinary Review concurred in the finding of fact by the Trial Board that the accused was guilty of that charge, but recommends that "a public reprimand would be an adequate and appropriate sanction."

The majority of the Trial Board also found the accused guilty of the charge of handling a legal matter without adequate preparation and found him not guilty of three other charges in the complaint of the Oregon State Bar. The Board of Disciplinary Review, upon review of the record, found the accused not guilty of all four of such charges.

After reading the entire record, we agree with the recommendations by the Board of Disciplinary Review. We agree with the Trial Board, however, that the performance by the accused in the bankruptcy proceeding fell below the minimum acceptable standard of competence. We are also of the opinion that it would serve no good purpose to discuss in detail those four charges.

---

[1] The Trial Board recommended that the accused be required to certify in writing that "[h]e has read the Code of Professional Responsibility and Ethical Considerations"; that "[h]e will fully prepare for each matter of employment in the future by reviewing applicable law," and that "[h]e will not accept employment which violates DR 5-105."

The record reveals, however, that the accused was guilty of having an improper conflict of interest in filing a foreclosure proceeding naming, as defendants, persons then represented by him in bankruptcy proceedings, as charged in the complaint of the Oregon State Bar.

The accused, after serving in the U.S. Navy from 1942 to 1945 and working for several years thereafter, was admitted to the Oregon State Bar in 1960. Since 1968 he has practiced law in Hermiston. According to the evidence, he has a good reputation for honesty and fairness. Also, according to a Circuit Judge in Umatilla County, he is always well prepared in that court and has never been known by that judge to attempt to take advantage of any party or witness.

In October, 1975, the accused, as attorney for Mr. and Mrs. Raymond Harner, prepared a contract for the sale by them of real property and a business being conducted on that property (Husky Truck Stop and Cafe) to Crystal Gollyhorn, who then sold the business and leased the real property to a Mr. and Mrs. Pittman. On or about August 10, 1976, Mr. and Mrs. Pittman conveyed their interest in the business and lease to Mr. and Mrs. Gary Kalteich.

On April 18, 1977, the Kalteichs consulted with the accused regarding their deteriorating business and financial affairs. He informed them that he had prepared the original contract of sale for Mr. and Mrs. Harner. At that time, however, he did not represent Mr. and Mrs. Harner as their attorney. The accused was then retained by the Kalteichs to file bankruptcy proceedings.

On April 20, 1977, the accused filed a bankruptcy petition for the Kalteichs. That petition disclosed the Kalteichs' liabilities with respect to the Husky Truck Stop and Cafe. The Kalteichs ceased making payments on their Husky Truck Stop obligations. This caused Ms. Gollyhorn to default on her obligations to the

Harners. Meanwhile, substantial amounts of unpaid federal and state taxes on the property and business had also accrued.

On or about June 3, 1977, while still attorney of record for the Kalteichs in the bankruptcy proceedings, the accused, as attorney for the Harners, filed a suit in the Circuit Court for Umatilla County to foreclose the contract of sale to Ms. Gollyhorn. The complaint in that suit named as defendants the Kalteichs, as well as Ms. Gollyhorn, Mr. and Mrs. Pittman, the United States of America, the State of Oregon, and Umatilla County. The prayer of that complaint sought, among other relief, a judgment of over $100,000 against all of the defendants, including Mr. and Mrs. Kalteich.

It appears that in alleging certain liens and facts relating to the possible interest of the Kalteichs in the Husky Truck Stop, the accused may have relied upon information acquired by him in his representation of them in the bankruptcy proceeding. Any claim of interest by them in that property did not appear in a preliminary title report secured by the accused on the Husky Truck Stop property before filing the foreclosure proceeding.

Mr. and Mrs. Kalteich then delivered to another attorney the complaint served upon them in the foreclosure proceedings. They also consulted that attorney about problems arising from the fact that the bankruptcy petition, as filed by the accused, did not include some creditors.[2] By letter dated June 22, 1977, that attorney suggested that the accused resign as the Kalteichs' attorney in the bankruptcy proceedings.

By letter dated June 24, 1977, the accused replied that his only representation of the Kalteichs was to file the bankruptcy petition and appear at the first

---

[2] Mr. Kalteich paid $290 to other attorneys to file amended schedules in the bankruptcy proceedings.

meeting of creditors; that if they needed further representation in that matter he would resign as attorney of record.

On or about July 3, 1977, the accused (who acknowledged that it was a "mistake" or "inadvertency" to pray for a money judgment against Kalteich in the foreclosure proceeding) filed an amended complaint in the foreclosure suit, still naming them as defendants, but no longer seeking a personal judgment against them. The Kalteichs did not file an appearance in that suit. An order of default was then taken against them and a decree was entered on December 13, 1977, foreclosing any interest claimed by them in the Husky Truck Stop property.

Meanwhile, as a result of a complaint by Mr. and Mrs. Kalteich to the Oregon State Bar, a grievance committee held a meeting with the accused on November 30, 1977, to discuss that complaint. At that time members of the grievance committee expressed the view that the accused "was continuing in a conflict of interest situation" and that perhaps the best thing for him would be to resign as attorney for the Harners in the foreclosure proceedings. The accused then consulted a Pendleton lawyer, who advised him by letter dated December 6, 1977, that there was no improper conflict of interest because Kalteich was not a necessary party to the foreclosure; that "the joinder of Kalteich was unfortunate in that it gives the appearance of conflict when in fact none existed"; that "this damage has already been done," but that the accused has "represented the plaintiff through a long series of pleadings, motions, negotiations and settlements," and that the Harners, as his clients, were entitled to his continued representation in the foreclosure proceedings.

The accused then notified the grievance committee that "in reliance upon (that) advice" he had "decided that it was in the best interests of the plaintiffs for me to remain in the case"; that "what damage, if any to

the Kalteichs has been done and I owe the duty to my clients to finish the matter."

Defendant contends by his brief in this court that under the facts of this case he "was not acting in conflict of interest as to Harner or Kalteich"; and "at no point" was "in a position wherein he had to take on behalf of Harner an interest adverse to Kalteich"; that "Kalteich was not a necessary party in the foreclosure" and "naming him was an unfortunate act of jeofaile[3] but certainly was not intentional as judgment was also asked" against all other defendants and "the error was immediately corrected by an amended complaint"; that "the accused was guilty of a single act of ordinary negligence," and that "there should be no public reprimand" but that "the accused should (only) be required to pay the fee of Donald Yokom incurred in filing amended schedules" in the bankruptcy proceedings.

We cannot agree with these contentions by the accused. In our judgment the conduct of the accused in this case involved more than ordinary negligence. On the contrary, we agree with the findings by the Trial Board and the Board of Disciplinary Review that the accused had an improper conflict of interest in filing the suit to foreclose the contract on behalf of the Harners, naming, among other defendants, the Kalteichs, who were then being represented by the accused in pending bankruptcy proceedings.

Disciplinary Rule 5-105 provides:

"Refusing to Accept or Continue Employment if the Interests of Another Client May Impair the Independent Professional Judgment of the Lawyer.

"(A)    A lawyer shall decline proffered employment if the exercise of his independent professional judgment in behalf of a client will be or is likely to be adversely affected by the

---

[3] At common law a "jeofaile" was an error or oversight in pleading, and "statutes of jeofailes" permitted the amendment of pleadings for such errors. Blacks Law Dictionary (1951).

acceptance of the proffered employment, except to the extent permitted under DR 5-105(C).

"* * * * *

"(C) In the situations covered by DR 5-105(A) and (B), a lawyer may represent multiple clients if it is obvious that he can adequately represent the interest of each and if each consents to the representation after full disclosure of the possible effect of such representation on the exercise of his independent professional judgment on behalf of each."[4]

It is not contended in this case that the Kalteichs consented to the representation by the accused of the Harners in their suit to foreclose their contract of sale, naming the Kalteichs as defendants, among others.

In determining whether a conflict of interest exists for the purposes of DR 5-105A, it is instructive to consider the ethical principles on which that rule is based. Ethical Consideration 5-15 of the Code of Professional Responsibility provides:

"If a lawyer is requested to undertake or to continue representation of multiple clients having potentially differing interests, he must weigh carefully the possibility that his judgment may be impaired or his loyalty divided if he accepts or continues the employment. He should resolve all doubts against the propriety of the representation. A lawyer should never represent in litigation multiple clients with differing interests; and there are few situations in which he would be justified in representing in litigation multiple clients with potentially differing interests. If a lawyer accepted such employment and the interests did become actually differing, he would have to withdraw from employment with likelihood of resulting hardship on the clients; and for this reason it is preferable that he refuse the employment initially. * * *" (Footnote omitted)

---

[4] For the requirements of consent after full disclosure in such cases, *see In re Boivin*, 271 Or 419, 423-27, 533 P2d 171 (1975).

Thus, a lawyer should undertake no representation in which there would be either an actual conflict of interest or a potential conflict of interest. *In re Porter*, 283 Or 517, 523, 584 P2d 744 (1978). *See also In re Banks*, 283 Or 459, 476-77, 584 P2d 284 (1978), in which this court quoted with approval from Wise, Legal Ethics 273 (2d ed 1970):

> "* * * If there is the slightest doubt as to whether or not the acceptance of professional employment will involve a conflict of interest between two clients or with a former client, or a conflict between the interests of any client and that of the attorney, or may require the use of information obtained through the service of another client, the employment should be refused."

To the same effect, *see* Drinker, Legal Ethics, 104 (1953).

In recent years this court has not infrequently reprimanded lawyers for conduct involving improper conflicts of interest. *See In re Porter, supra; In re Banks, supra; In re Boivin*, 271 Or 419, 423-27, 533 P2d 171 (1975); *In re Mumford*, 285 Or 559, 591 P2d 1377 (1979); *In re Barrett*, 269 Or 264, 524 P2d 1208 (1974); *In re Zafiratos*, 259 Or 276, 486 P2d 550 (1971), and *In re Hedrick*, 258 Or 70, 481 P2d 71 (1971). *Cf. In re Brown*, 277 Or 121, 559 P2d 884, 277 Or 731, 561 P2d 1030 (1977). *See also* Annot. 52 ALR 2d 1243, 1247 (1957), citing cases from other jurisdictions in support of the following rule:

> "It is firmly established as a general rule that an attorney who has acted for one client cannot, without being guilty of serious misconduct, thereafter undertake representation of a client whose interests are adverse to those of the former client."

This is not a case in which the conflict of interest arose from a business transaction between an attorney and a client or from a law suit by an attorney against a former client. In this case the lawyer, while still representing a present client in one legal proceeding, filed a

law suit against that client, among others, on behalf of another client.

In such a case it is clear that a lawyer must heed the oft-quoted Biblical admonition that "No man can serve two masters."

It may or may not be true that the Kalteichs were not necessary parties in the foreclosure suit. They had, however, occupied the Husky Truck Stop on the property which was the subject of that suit and were apparently considered by the accused to be necessary parties to that suit. As such, the interest of the Kalteichs, for whom the accused was still the attorney of record in their bankruptcy proceedings, was clearly adverse to that of the Harners, who the accused undertook to represent in the foreclosure suit.

It may also be true that it was a "mistake," as claimed by the accused, to pray for a judgment of over $100,000 against the Kalteichs and other defendants in that proceeding. The fact remains, however, that the interest of the Kalteichs, as parties whose actual or possible interest in the Husky Truck Stop property was sought to be foreclosed in that suit, was adverse to the interest of the Harners, for whom the accused undertook to foreclose that contract against all named defendants, including the Kalteichs.

For these reasons, we hold that the accused had an improper conflict of interest when he undertook to represent the Harners in filing the suit to foreclose the Harner contract on the Husky Truck Stop property, naming the Kalteichs, among others, as defendants in that suit. We also hold that under these facts a public reprimand of the accused is required, as recommended by the Board of Disciplinary Review, and this opinion shall stand as that reprimand. We also hold that the accused should pay the fee of $100 incurred on behalf of the Kalteichs for services by another attorney in filing amended schedules in the bankruptcy proceeding, in accordance with the expressed willingness of

[568]

the accused to do so. In addition, we hold that the accused should also pay the fee of $190 incurred on behalf of the Kalteichs for services by another attorney in subsequent proceedings, as recommended by the Trial Board.

Costs and disbursements are also awarded to the Oregon State Bar.