Argued and submitted December 6, 1983, accused reprimanded March 27, 1984

In re: Complaint as to the Conduct of
# LAURENCE E. THORP,
*Accused.*

(OSB 81-86, SC 29566)

679 P2d 857

Ralph F. Cobb, Eugene, argued the cause and filed the brief for Accused. With him on the brief was Luvaas, Cobb, Richards & Fraser, P.C., Eugene.

John R. Teising, Eugene, argued the cause and filed the brief for the Oregon State Bar. With him on the brief was Hutchinson, Harrell, Cox, Teising & Anderson, P.C., Eugene.

PER CURIAM

## PER CURIAM

The Oregon State Bar filed a complaint against Laurence E. Thorp accusing him of unethical conduct in three separate causes. It alleged that Thorp had violated the Disciplinary Rules of the Oregon State Bar in matters concerning Richard E. Miles, a former client.

The Bar's complaint is dated September 2, 1982. The three member Trial Board found Thorp not guilty of each cause of complaint and recommended to this court that each cause be dismissed. On April 22, 1983, the seven member Disciplinary Review Board concurred in the findings and conclusions of the Trial Board and also recommended that all three charges be dismissed. We find Thorp guilty of one cause and not guilty of the two remaining causes of complaint.

Oral arguments were made before this court on December 6, 1983. Substantial changes were made in the laws relating to the discipline of attorneys by Chapter 618, Oregon Laws 1983. However, that chapter provides that any proceedings pending under the former statutes on January 1, 1984 shall be completed as provided in the former statutes.[1]

Under former ORS 9.535(3), after the Disciplinary Review Board files its decision and recommendation, this court may adopt, modify, or reject the same and make an appropriate order.[2] We make our own independent review of the evidence.[3] *In re Thomas,* 294 Or 505, 521, 659 P2d 960 (1983). The proceedings are neither criminal or civil, but *sui generis.* Former ORS 9.535(6).[4] The accused is entitled to the presumption that he is innocent of the charges. *In re Galton,* 289 Or 565, 579, 615 P2d 317 (1980). The charges must be

---

[1] Section 1, Chapter 618, Oregon Laws 1983 provides:

"ORS 9.525, 9.535, 9.550, 9.560, 9.570 and 9.580 are repealed on January 1, 1984. However, any proceedings pending under ORS 9.525, 9.535, 9.550, 9.560, 9.570 and 9.580 on January 1, 1984, shall be completed as provided in those statutes."

[2] This part of the prior procedure is retained by ORS 9.536(3).

[3] Under the new procedure our review will be "de novo."

[4] Under the new procedure, ORS 9.529 in part provides:

"Bar proceedings relating to discipline, admission and reinstatement are neither civil or criminal in nature. They are sui generis and within the inherent power of the Supreme Court to control. * * *"

proved by clear and convincing evidence. *In re Chambers,* 292 Or 670, 672, 642 P2d 286 (1982).

Thorp commenced practicing law in 1970. Thorp's contact with Miles as a client and former client spanned the period from early 1974 to July, 1980. The three causes of complaint involve separate and distinct matters and have no relationship to each other except that the chief actors are Thorp and Miles. For the sake of keeping the events in a chronological order, we will consider the causes in a different sequence from that set out by the Bar in its complaint. We will refer to the separate causes of complaint as: "Tri-Penta loan to Miles," "Jack Lively versus Miles," and "Hiatt cross-claim against Miles."

**TRI-PENTA LOAN TO MILES** (Oregon State Bar's Third Cause)

In early 1974, Jack Lively, Thorp's senior law partner, introduced Thorp to Richard E. Miles. Between that time and June, 1976, Thorp developed a lawyer-client relationship with Miles and his corporation, Miles-Hiatt Investments, Inc.

Miles was the majority stockholder and the active manager of Miles-Hiatt Investments, Inc. The corporation was involved in developing apartments houses, shopping centers and warehouses costing millions of dollars. Miles employed Ron Peery, a former banker with 18 years experience, to assist with the financial affairs of the corporation. Miles normally handled complex financial transactions himself without consulting his lawyer. On various occasions he had prepared legal documents himself.

In June, 1976, the corporation needed a short term loan of $40,000. Thorp was a partner in Tri-Penta, an eight member partnership that was primarily interested in investing in real estate. Peery approached another partner of Tri-Penta about obtaining the loan. Miles contacted Thorp for the same reason. Miles offered to pay 40 percent per annum interest. Thorp told Miles he could not participate in the negotiations for the loan with Tri-Penta because of his conflict of interest. He also told Miles that the loan would have to exceed $50,000 to keep it from violating the usury laws in effect at that time.

On June 4, 1976, Miles-Hiatt Investment, Inc. executed and delivered to Tri-Penta its promissory note in the amount of $50,100 "Due in no less than 30 days nor more than 120 days" with interest at the rate of 40% per annum. The note was secured by a second mortgage on the Miles' residence. The documents were prepared by either Miles or Peery.[5]

The promissory note was not paid when due. It was renewed, but the interest rate was not lowered. Sometime after the note was reduced by $20,000, it was delivered to a different attorney for collection. Apparently, some years later after Miles and Thorp had a disagreement over a different matter, Miles made a complaint to the Oregon State Bar.

The Bar in its formal complaint accuses Thorp of violating the following Disciplinary Rules:

"DR 5-101(A):

"Except with the consent of his client after full disclosure, a lawyer shall not accept employment if the exercise of his professional judgment on behalf of his client will be or reasonably may be affected by his own financial, business, property, or personal interests."

"DR 5-104(A):

"A lawyer shall not enter into a business transaction with a client if they have differing interests therein and if the client expects the lawyer to exercise his professional judgment therein for the protection of the client, unless the client has consented after full disclosure."

The Trial Board found that Thorp was not guilty of this cause of complaint and recommended that we dismiss it. In reaching that conclusion it found "the client did not rely upon" Thorp for any legal advice in connection with the transaction. The Trial Board added that "it might have been preferable for the accused to advise his client to seek independent legal advice after explaining * * * the conflict of interest."

The Oregon State Bar in its brief in this court in connection with this cause has set out the following assignment of error:

---

[5] It is apparent that no lawyer on behalf of Tri-Penta prepared the documents. In the promissory note the name of Tri-Penta is referred to as "Tri-Penpa" and in the mortgage it is designated as a corporation instead of a partnership.

"The Trial Board and the Review Board erred in failing to conclude that Mr. Miles did rely on the Accused for professional advice during the length of the loan transaction in the Tri-Penta matter and, therefore, should have been advised to seek separate counsel."

The Trial Board's finding and the Bar's assignment of error as to whether Miles relied upon Thorp's professional advice is keyed to that part of DR 5-104(A) which provides "and if a client expects the lawyer to exercise his professional judgment therein for the protection of the client." *See, In re Montgomery*, 292 Or 796, 643 P2d 338 (1982); *In re Drake*, 292 Or 704, 642 P2d 296 (1982).[6]

■   The separate question of whether Thorp should have advised Miles to seek independent counsel is not directly provided for in DR 5-104(A), but results from this court's opinion in the case of *In re Bartlett*, 283 Or 487, 496-97, 584 P2d 296 (1978):

"Although the exact words of DR 5-104 do not cover the duty to advise the client to seek independent legal advice, we infer from the record that the accused was certainly not taken by surprise. Lest there be any doubt concerning that duty as being encompassed by DR 5-104, we now hold that in any situation in which a lawyer shall enter into a business transaction with his client where they have differing interests and the client expects the lawyer to exercise his professional judgment in the transaction for the protection of the client, the lawyer must *at least advise* the client to seek independent legal counsel. *Compare In re Brown*, 277 Or 121, 129, 559 P2d 884 (1977); *In re Boivin*, 271 Or 419, 427-28, 533 P2d 171 (1975)." (Emphasis in original.)

This cause of complaint boils down to a question of fact: did Miles rely on Thorp for professional advice?

The adjective most used by the witnesses to describe Miles' business knowledge was "sophisticated." Ron Peery, the former banker, testified: "I don't know that I ever met a person more knowledgeable with a knack for understanding business * * *." A Certified Public Accountant described Miles "as a very active investor, dealer, almost a wheeler-dealer in

---

[6] In both the *Montgomery* and *Drake* cases, the lawyer was borrowing the money from the client at a rate of interest that violated the usury laws. This case is the reverse—the client was borrowing money from the lawyer at a rate that did not violate the usury laws.

real estate, sophisticated." Gene Hiatt, who had been in business with Miles, said in effect that Miles was very sophisticated in business transactions and that Miles had been Chairman of Board of Pioneer Title. A real estate agent, formerly employed by Miles-Hiatt Investment, Inc., described Miles as extremely sophisticated and very knowledgeable in business matters. The manager of a financial institution testified that she had done business with Miles for a period of 15 years and that "he was quite sophisticated and his knowledge was quite good."

It is undisputed that when Miles first approached Thorp about obtaining a loan from Tri-Penta, Thorp informed him of the conflict in interest. Miles frankly admitted this. Even so, the Oregon State Bar contends that during the life of the loan, Miles expected Thorp to: (1) notify him of any error in the security instrument; (2) advise him of any information potentially harmful to his financial interests; (3) advise him of any changes in the law that would affect his position; and (4) continue to look out for his interests.

The record does not support the Bar's contentions. The testimony by Miles on cross-examination is interesting:

"Q.   Okay, you didn't expect him [Thorp] to play any other role because of that conflict; isn't that correct, or couldn't?

"A.   Well, no, I didn't — no.

"* * * * *

"Q.   What kind of legal advice in the process of this, getting that money, did you expect from Larry Thorp?

"A.   From that point of view, I didn't expect legal advice.

"* * * * *

"Q.   And as far as you were concerned, you didn't care about that conflict, you waived it or essentially said, 'That's fine, I still need the money, I want to go ahead with the transaction'; isn't that correct?

"A.   That is probably a good summation."

We think that it is unreasonable for Miles to take the position after-the-fact that once the loan was obtained, he expected Thorp to "look out for" Miles' interests during the balance of the life of the loan. This is like saying: "I am a financial wizard and I don't need your help to get the loan, but

once I have the money, I want you to put your lawyer's hat back on and protect me from you and your investment partners." There is nothing in the record to indicate that Miles forewarned Thorp that he was going to change his position once the loan was received.

We find that Miles did not expect Thorp to exercise his professional judgment to protect Miles either in obtaining the loan or during the life of the loan. Therefore, under *In re Bartlett*, 283 Or 487, 584 P2d 296 (1978), it was not required that Thorp advise Miles to seek independent counsel.

Thorp is not guilty of violating DR 5-104(A). We hold DR 5-101(A) simply does not apply to this fact situation and therefore Thorp cannot be guilty of violating it. The cause of complaint concerning the Tri-Penta loan is dismissed.

**JACK LIVELY VERSUS MILES** (Oregon State Bar's First Cause)

In 1975, Jack Lively, Thorp's law partner, sold Miles corporate stock and received a promissory note in payment. The purchase price note was replaced by a promissory note in the amount of $23,218.69 due in February, 1977. This note was not paid in full on the due date.

In May of 1979, Lively discovered that he had terminal cancer. To get his affairs in order, Lively insisted that the law firm sue Miles and collect the balance due on the promissory note. Thorp opposed Lively's effort to sue Miles because there was a current client-attorney relationship between Miles and Thorp.

On May 18, 1979, Lively sent Thorp a memorandum which in part said: "I am tired of messing with Dick Miles so I am going to have George [Morris] sue him." George Morris was an associate of the law firm who was assigned to work with Lively. Morris was extremely loyal to Lively. Not only was Lively the senior member of the law firm, he was also the dominant partner.

At two different times Thorp talked to Morris about the problem. The last time Thorp told Morris that he was opposed to the filing of the complaint against Miles and that he would do everything he could to prevent it. Sometime prior to June 21, 1979, the matter was considered at a partnership

meeting. Thorp does not remember attending the meeting. As a result of the meeting Morris, in the presence of a third partner, called the Oregon State Bar to get an informal ethics opinion. The Bar advised that the action would be appropriate if Miles were no longer a client of the law firm. Morris did not contact Thorp concerning the Bar's opinion.

Thorp was on vacation the week of June 18th. Morris prepared the complaint for Lively against Miles on June 20th or 21st. Thorp settled a case with the Bureau of Labor for Miles on June 27th. The Lively complaint against Miles was filed on July 3rd. Thorp did not find out that the complaint had been filed until the week of July 8th at which time he tried repeatedly without success to call Miles. On July 16th, Thorp wrote to Miles withdrawing as his lawyer.

The Bar on this cause of complaint accused Thorp of violating DR 5-105. We think that the Bar has specific reference to DR 5-105(B):

"A lawyer shall not continue employment if the exercise of his independent professional judgment in behalf of a client will be or is likely to be adversely affected by his representation of another client except to the extent permitted under DR 5-105(C)."[7]

The Oregon State Bar in its brief in this Court set out the following assignment of error:

"The Trial Board and the Review Board erred in failing to conclude that the Accused knew a lawsuit by his firm was going to be filed against a client of his and failed to withdraw from representing the client until after the lawsuit was prepared and filed."

The gravamen of the complaint filed by the Bar as to this cause is:

"8. Prior to filing the lawsuit against Miles, Morris consulted with Lively and the Accused as to whether it was ethically proper to proceed against Miles on the Lively note while the Accused continued to represent Miles. The Accused

---

[7] DR 5-105(C) provides:

"In the situations covered by DR 5-105 (A) and (B), a lawyer may represent multiple clients if it is obvious that he can adequately represent the interest of each and if each consents to the representation after full disclosure of the possible effect of such representation on the exercise of his independent professional judgment on behalf of each."

led Morris to believe that he had terminated his representation of Miles and that Miles was no more than a former client at the time the lawsuit against Miles was being prepared."

There is no direct evidence in the record to support either charge of the complaint or the Bar's position in its assignment of error. The evidence shows that Thorp knew that there was a strong possibility that Morris under Lively's direction would file the complaint against Miles, but there is no evidence that Thorp *knew* that an actual decision to do so had been made. We cannot draw an inference based upon this record to support the Bar's position.

There is no evidence from which an inference could be drawn that Thorp "led Morris to believe he had terminated his representation of Miles" as alleged in the Bar's complaint.

The cause of complaint concerning the *Lively v. Miles* case is dismissed.

### HIATT CROSS-COMPLAINT AGAINST MILES (Oregon State Bar's Second Cause)

Bert Wells was Richard E. Miles' brother-in-law. In April 1977, Wells sold his stock in Miles-Hiatt Investments, Inc. back to the corporation. Wells received payment in the form of a promissory note in the amount of $15,000 from Miles and Gene B. Hiatt as individuals. Although Thorp was the attorney for the corporation and Miles during this period of time, he had nothing to do with the Wells transaction.

In June 1977, Miles instructed Thorp to prepare an agreement to redeem all of Gene B. Hiatt's stock in Miles-Hiatt Investments, Inc. for certain equipment owned by the corporation. Thorp prepared the agreement and it was signed by Hiatt individually and by Miles as president of the corporation on June 16, 1977. On the same date, Hiatt and Miles entered into an agreement whereby Miles agreed to hold and save Hiatt harmless from all obligations of Miles-Hiatt Investments, Inc. Thorp did not prepare and had no knowledge of the save harmless agreement.

On July 16, 1979, Thorp withdrew from any further legal representation of Miles.

In March of 1980, Bert Wells filed an action against Miles and Hiatt on the promissory note. Hiatt requested that

Thorp represent him in the matter and advised Thorp of the save harmless agreement. Thorp tendered the defense to Miles' new lawyer. Thorp on behalf of Hiatt then prepared and filed a cross claim against Miles based upon the stock redemption contract and the save harmless agreement. The prayer of the cross claim is in part:

> "In the event, however, judgment is rendered against defendant GENE B. HIATT and in favor of Plaintiff, Defendant GENE B. HIATT prays for judgment against RICHARD E. MILES in an amount equal to the judgment entered in favor of Plaintiff, and also for Defendant GENE B. HIATT's reasonable attorney fees and court costs incurred in defending against Plaintiff's claim."

The cross claim was served on June 13, 1980. Miles complained to the Oregon State Bar and Thorp withdrew from further participation in the case. This proceeding followed.

The Bar in its complaint accused Thorp of violating DR 5-105. As in the previous cause, we think that the Bar is only referring to a portion of the disciplinary rule.

That portion is DR 5-105(A):

> "A lawyer shall decline proffered employment if the exercise of his independent professional judgment in behalf of a client will be or is likely to be adversely affected by the acceptance of the proffered employment, except to the extent permitted under DR 5-105(C)."[8]

The Bar in its assignment of error to this cause of action contends that the Trial Board and the Disciplinary Review Board erred in making the following finding of fact:

> "The Trial Board finds that the accused's representation of Hiatt in the lawsuit brought by Wells and in the cross claim against Miles did not arise out of a transaction wherein the accused represented Miles or the corporation nor were there sufficient connections with the accused's representation of Miles and the corporation prohibiting the accused from representing Hiatt against Miles in the cross claim."

We interpret the above finding of fact to mean: (1) the save harmless agreement between Hiatt and Miles and the stock redemption agreement between Hiatt and Miles-Hiatt

---

[8] See footnote 7, *supra.*

Investment, Inc. did not arise out of the same transaction, and (2) Thorp did not have any confidential information which would prevent him from representing Hiatt in that particular case against Miles.

We held in the case of *In re Banks,* 283 Or 459, 476-77, 584 P2d 284, 1 ALR4th 1105 (1978), that the Oregon Code of Professional Responsibility does not directly resolve conflict of interest issues. We also found that DR 5-105 is the disciplinary rule which comes the closest to resolving conflict of interest issues. 283 Or at 476-77.[9] Former ORS 9.535(6) acknowledges the inherent power of the courts to discipline members of the state bar.

In his brief in this court, in addition to agreeing with the Trial Board's above quoted finding of fact, Thorp has summed up his position as follows:

> "Because the Accused did not draft the Hold Harmless Agreement, nor advise either party regarding its terms, and because the cross claim against Miles was based entirely on the Hold Harmless Agreement, there is no violation of the foregoing ethical rule. Furthermore, no confidential information obtained from Miles was available, needed, or used by the Accused in connection with representing Hiatt on the matter * * *."

Thus, Thorp and the Bar have in effect agreed that the controlling issues as to this cause are: (1) did the cross claim by Hiatt against Miles arise out of a transaction wherein Thorp had previously represented Miles? and (2) did Thorp have any confidential information from his previous representation of Miles which could be used to Hiatt's advantage in the cross claim?

We disagree with Thorp's statement that "the cross claim against Miles was based entirely on the Hold Harmless Agreement." The cross claim by Hiatt against Miles in part is as follows:

> "I.

> "That prior to June 16, 1977, both Defendants [Miles and Hiatt] herein were shareholders in Miles Hiatt Investments, Inc., an Oregon corporation. That by agreement dated June

---

[9] Denecke, *Complexities of Modern Practice Require Changes in Oregon Ethics Code,* 19 Willamette L J 637 (1983).

16, 1977, such corporation agreed to redeem the stock of defendant GENE B. HIATT pursuant to the Redemption Agreement * * *.

"That *contemporaneously* with entering into such Stock Redemption Agreement, Defendants entered into a separate agreement * * * pursuant to which Defendant RICHARD E. MILES agreed to save harmless and indemnify Defendant GENE B. HIATT from all obligations entered into by GENE B. HIATT on behalf of such corporation." (Emphasis added.)

The above are Thorp's own words. By alleging on behalf of Hiatt that the agreements were entered into "contemporaneously" Thorp has given a strong indication that when he drafted the cross claim, he considered the two agreements to be a part of the same transaction. Maybe it was necessary to plead the "stock redemption agreement" to prove consideration for the "save harmless agreement." The promissory note in the amount of $15,000 which Wells was suing to collect was signed by Hiatt and Miles as individuals. Maybe it was necessary to plead the "stock redemption agreement" to prove that Wells' promissory note was in fact a corporation obligation. In any event, if Thorp had not considered the "stock redemption agreement" necessary to the cross claim, he would not have pleaded it.

There appears to be another reason for pleading the "stock redemption agreement" and considering it as a part and parcel of the "save harmless agreement." The cross claim prays for attorney fees in either of two situations: (1) against Wells if Hiatt is successful in defending the complaint, and (2) against Miles if Hiatt is unsuccessful against Wells, but recovers a judgment against Miles. Under the first situation, Hiatt would be entitled to attorney fees under Wells' promissory note and ORS 20.096. In the second situation, the "stock redemption agreement" provides for attorney fees to the prevailing party while the "save harmless agreement" does not contain that type of a provision.

We hold that the "stock redemption agreement" and the "save harmless agreement" were a part of the same transaction. Thorp in the cross claim was suing a former client, Miles, in connection with a transaction in which he had previously represented Miles.

We cannot tell from the record whether Thorp used confidential information obtained while representing Miles in the preparation of the cross claim. He withdrew before the case went to trial. All lawyers know that one cannot predict what will happen during a trial—there is no way to foresee what turns or twists a particular case will take. There is no means by which Thorp could have guaranteed Miles or Hiatt that during the course of the trial some previously acquired confidential information would not have become relevant.

There is no direct evidence, but we infer that Hiatt did not employ Thorp solely to file and obtain a judgment against Miles on the cross claim. Hiatt probably also employed Thorp to collect the judgment, if one was obtained, against Miles. Less than one year elapsed between the time that Thorp withdrew from active representation of Miles until the filing of the cross claim. Miles was in serious financial trouble and the record shows numerous unsatisfied judgments against him. It does not take a great deal of imagination to think of situations in which a lawyer in Thorp's position could use his prior knowledge of Miles' affairs to discover assets to satisfy a judgment. The other side of the coin is that if Thorp's hands were tied on discovery because of prior knowledge, then he could not adequately represent Hiatt.

In a conflict of interest case under prior Rules of Professional Conduct, we said there was a violation

"* * * if a lawyer undertakes litigation for a subsequent client which, if successful, might reasonably impose liability on a former client by reason of a transaction in which the lawyer represents the former client." *In re Nicholas D. Zafiratos,* 259 Or 276, 281, 486 P2d 550 (1971).

After the adoption of DR 5-105, we reaffirmed the above statement in *In re Adams,* 293 Or 727, 737-38, 652 P2d 787 (1982).

*In re Banks, supra,* is a case where the conflict of interests resulted from disputes between family members in a closely held corporation. In discussing what constitutes a conflict of interests, we quoted from Drinker, Legal Ethics 104 (1953):

" ' "The test of inconsistency is not whether the attorney has ever appeared for the party against whom he now proposes to appear, but it is whether his accepting the new retainer will

require him, in forwarding the interests of his new client, to do anything which will injuriously affect his former client in any matter in which he formerly represented him *and also* whether he will be called upon, in his new relation, to use against his former client knowledge or information acquired through their former connection." ' Drinker, Legal Ethics 105 (1953) quoting Morrow, J., in Re Boone, 83 F 944, 952-53 (1897). (Emphasis added.)" 283 Or at 476.

*In re Mumford,* 285 Or 559, 591 P2d 1377 (1979), involved a situation where the accused lawyers first represented the husband in making an installment dissolution settlement with his wife. The wife remarried, and then died. Prior to her death she assigned her interest in the agreement to her new husband. The accused lawyers represented the new husband in an attempt to collect accrued installments due from their former client. This court held there was a patent conflict of interest. We said that while DR 5-105 does not fit the situation exactly, it had been so construed in *In re Banks, supra,* which in turn quoted from Drinker, Legal Ethics 104 (1953), "to prevent anything from being done which would tend to affect a former client injuriously in any matter in which the former client had been represented." 285 Or at 562.

This court found a conflict of interest in the case of *In re Hershberger,* 288 Or 559, 606 P2d 623 (1980). The accused lawyer filed a bankruptcy proceeding for a husband and wife and while the proceeding was still pending, joined them as party defendants in a foreclosure suit. We quoted with approval the rule from other jurisdictions set out in 59 ALR2d 1243, 1247 (1957):

> "It is firmly established as a general rule that an attorney who has acted for one client cannot, without being guilty of serious misconduct, thereafter undertake representation of a client whose interests are adverse to those of the former client." 288 Or at 567.

■ We hold that a lawyer violates DR 5-105(A) if he represents a client and then subsequently as to same transaction attempts to represent a second client in a position that is adverse to the former client.[10] It is not necessary that the

---

[10] Probably the best rule for a careful lawyer to follow in his practice is set out in Wise, Legal Ethics 273 (2d ed 1970):

"'* * * If there is the slightest doubt as to whether or not the acceptance of professional employment will involve a conflict of interest between two clients or

knowledge, possession or disclosure of confidential information be involved to constitute a conflict of interest or violation of the Disciplinary Rule. *In re Mumford, supra,* 285 Or at 562. However, the probability of the existence of confidential information is one of the reasons for the conflict of interest rule. *In re Banks, supra,* 283 Or at 475.

We find by clear and convincing evidence that Thorp, by representing Miles in a transaction and then subsequently representing Hiatt on the same transaction in a position that was adverse to Miles, violated DR 5-105(A).

It could be argued that DR 5-105(A) does not specifically prohibit the conduct of which Thorp has been found guilty. Our interpretation of DR 5-105(A) set out in *In re Banks, supra,* has been published since September, 1978. The complaint in the case of *Bert Wells v. Miles and Hiatt* was filed in March, 1980. The cross claim prepared by Thorp was served in June, 1980. All Oregon lawyers are on notice of the disciplinary decisions published by this court.

It could also be argued that Thorp's conduct in this case is not more flagrant as that of the lawyers in *In re Mumford, supra,* and in *In re Hershberger, supra,* where the sanction in each case was a public reprimand. A comprehensive list of this court's recent decisions in conflict of interests cases is set out in *In re Boyer,* 295 Or 624, 629-30, 669 P2d 326 (1983). We noted that the disparity in sanctions in that list of cases was caused by the particular circumstances of each case. We also said:

> "We note, however, that this particular type of unethical conduct appears to be on the rise. Deterrence thereof for the public good may be accomplished by more severe penalties for this kind of unprofessional conduct which may occur after the date this opinion is published." 295 Or at 630.[11]

---

with a former client, or a conflict between the interests of any client and that of the attorney, or may require the use of information obtained through the service of another client, the employment should be refused.' "

The above quote is cited with approval in *In re Hershberger,* 288 Or 559, 567, 606 P2d 623 (1980), and *In re Banks,* 283 Or 459, 476, 584 P2d 284 (1978).

[11] The prohibited conduct in this case occurred in March-June, 1980 and *In re Boyer, supra,* was not published until September, 1983.

■    In this case the Bar requested that "reasonable sanctions" be imposed against Thorp. We hold that this opinion shall serve as a public reprimand.

By way of summary, we find Thorp not guilty of "Tri-Penta loan to Miles" cause (Oregon State Bar's Third Cause), and the "Jack Lively versus Miles" cause (Oregon State Bar's First Cause), and guilty of the "Hiatt cross claim against Miles" cause (Oregon State Bar's Second Cause).

The Oregon State Bar is awarded costs.